FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

· 2014 DEC 11  P 1: 31

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| **Harley A. Hughes** | ) |
| | ) |
| 5208 Bedlington Terrace | ) |
| Alexandria, VA  22304 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| versus | )  Case No. `1:14CV1699-LMB-IDD` |
| | ) |
| **Immediate Response Technologies, LLC** | ) |
| A Delaware Limited Liability Company | ) |
| | ) |
| Serving the Delaware Registered Agent: | ) |
| Corporation Service Company | ) |
| 2711 Centerville Road, Suite 400 | ) |
| Wilmington, DE  19808 | ) |
| | ) |
| and | ) |
| | ) |
| **Immediate Response Technologies, Inc**. | ) |
| A Maryland Corporation | ) |
| | ) |
| Serving the Maryland Registered Agent: | ) |
| CSC-Lawyers Incorporating Service Co. | ) |
| 7 St. Paul Street, Suite 1660 | ) |
| Baltimore, MD  21202 | ) |
| | ) |
| Defendants. | ) |
| | ) |

# COMPLAINT FOR DAMAGES

## Summary of the Case

This is a case of fraud and deception, of promises made and broken, and of a written 4-year employment contract tossed aside and a valuable Severance Package disregarded.

*Lt. Gen Harley Hughes (USAF-Retired).* Gen. Hughes is not a typical plaintiff and he was not a typical CEO and President for a small national defense manufacturing company. He is a retired 3-star general, a highly acclaimed fighter pilot, a decorated combat veteran, and a respected military and business leader. His military background, management accomplishments and high profile in the world of government contracts made him uniquely qualified to manage and lead a company whose primary customers are the United States Army and the National Guard.

*Gen. Hughes as CEO and President after the TVI Scandal.* In 2007, Gen. Hughes left a profitable consulting business to lead the rebuilding of TVI Corporation, a publicly-held company that had been torn apart by scandal. The President and Executive Vice President of TVI had been indicted, convicted, and ultimately sentenced in federal court for their direction of a fraudulent financial scheme. A beleaguered Board of Directors asked Gen. Hughes to serve as CEO and President of the company.

Gen. Hughes led the company through a painful bankruptcy precipitated by the earlier fraud. 6000 shareholders lost their investments; Gen. Hughes' 600,000 TVI shares (worth at one time $3.5 million) were then worthless.

*Immediate Response Technologies, Inc.* The company that emerged from the TVI bankruptcy, Immediate Response Technologies, Inc. (IRT Inc.), was a privately-held business encumbered by the debts of TVI. Gen. Hughes and his Executive Team owned 90% of the company's common stock; BB&T Bank, the creditor, held the Preferred Stock. The Executive Team patiently rebuilt the business from 2010-2013. In great part, it was Gen. Hughes' personal reputation and tireless efforts that saved IRT Inc. and enabled the company to not only survive but thrive.

---

***Gen. Hughes' Written 4-Year Employment Contract.*** For the successful rebuilding work, IRT Inc. rewarded Gen. Hughes in December 2012 with a written 4-year Employment Contract. The contract specifies Gen. Hughes' compensation, incentives, and benefits (including a Severance Package). The contract binds not only IRT Inc. but binds any "successor," which is defined to include any acquirer "which at any time, whether by purchase, merger, or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Company." As added protection for Gen. Hughes, the Employment Contract provides that "[a]ny other attempted assignment, transfer, conveyance, or other disposition of Executive's right to compensation or other benefits *will be null and void.*" (Emphasis added.)

***Federal Sequestration/Sale of the Business.*** When federal sequestration hit in 2013, IRT Inc.'s sales suffered. BB&T, as the principal creditor, pushed for a sale of the company. A detailed analysis prepared by the Chicago-based brokers hired to conduct the sale points to a $20 million to $26.4 million valuation.

The business sold in January 2014 in an asset purchase deal. But the sale was in fact a fire sale—the purchase price was $4.5 million, less than 20% of the business' value. The buyer was Immediate Response Technologies, LLC (IRT LLC), a newly-formed Delaware entity 100% owned by Severn Partners, LLC, a Wall Street-owned Maryland private equity firm. Severn Partners conducted several weeks of onsite due diligence, which included the review of IRT Inc.'s contracts. As signaled above, under the Employment Contract terms IRT LLC was substituted for IRT Inc. as the employer party.

***IRT LLC needed Gen. Hughes (at least until after the Sale).*** From the beginning of the discussions about the sale of IRT Inc., the condition was that Gen. Hughes and the members of his Executive Team would be retained and their compensation continued. The Executive Team also owned 90% of the common stock.

Not only had Gen. Hughes led the company away from its troubled past, but his presence and reputation provided the credibility for the Army and National Guard customers to trust the small company to produce and deliver the life-saving respirators, specialty filters and canisters

used in chemical and biological hazard responses.  IRT LLC needed Gen. Hughes to sign the necessary sale documents on behalf of IRT Inc. and to support the transition.

*False Assurances and Hollow Promises to Gen. Hughes.*  Severn Partners, and then IRT LLC, repeatedly assured Gen. Hughes that he would be retained as CEO and President with his compensation, incentives, and benefits (including the Severance Package) in place.  As the sale closing approached, the nervous buyer promised Gen. Hughes that he would earn fees tied to the multi-million dollar IRT Inc. sales pipeline.   But the representations made to Gen. Hughes were false and the promises soon broken.   Just days before the sale closing, *after* Gen. Hughes was induced by the false promises to sign the core sale documents, the buyer revealed to Gen. Hughes that he would not be the CEO and President (the other Executive Team members were being retained), but he would have a role on the new Board and he would earn fees from the existing business pipeline.   Those promises, too, proved to be false.

*The Ruby Tuesday Deceit.*  A few weeks later, IRT LLC's chairman asked for a quick offsite meeting with Gen. Hughes in advance of the first scheduled post-sale Board meeting.  They met at a nearby Ruby Tuesday.  The chairman apologized that he had to rush to the Board meeting, and they needed to make "minor" changes to the prior agreement with Gen. Hughes.  The chairman brought with him only a signature page.  Pressured and hurried by the chairman, Gen. Hughes signed the single page.

The next time Gen. Hughes saw the Ruby Tuesday signature page it was attached to a 7-page "contract."  Curiously, the supposed contract document pages are numbered, but the signature page is different, it has no number.   The terms would arguably strip Gen. Hughes of all the benefits of the Employment Contract including the Severance Package, and erase the multiple representations and promises made when the buyer desperately needed Gen. Hughes' full cooperation.

*The Damages.*  The Employment Contract has been trampled and its Severance Package disregarded.  The promises and representations made to Gen. Hughes to get his signatures on the sales documents and his cooperation in the transition were false when made.  The resulting

---

damages are real and substantial. Gen. Hughes' Employment Contract damages, which are separate from the fraud claims, are $1.331 million on the Employment Contract and $740,132 under the Severance terms, and under one statutory provision include the trebled value plus attorneys' fees. The damages for the fraud total $3.173 million. Under the actual fraud claim, Gen. Hughes claims an additional $1,500,000 in punitive damages. Under Count 3, the Ruby Tuesday Deceit fraud, Gen. Hughes claims $500,000 in punitive damages. Finally, IRT LLC has been unjustly enriched by $15.5 million to $20.5 million.

## Parties

1.     Plaintiff Harley A. Hughes, a long-time resident of Alexandria, Virginia, is a retired 3-star Air Force General.

2.     Defendant Immediate Response Technologies, LLC (IRT LLC) is a Delaware limited liability company with its principal place of business in Glenn Dale, Maryland. Glenn Dale is across the Woodrow Wilson Bridge in Prince George's County about 18 miles from the Alexandria federal courthouse. The Delaware Registered Agent for IRT LLC is Corporation Service Company.

3.     IRT LLC, formed on January 16, 2014, is wholly-owned by Severn Partners, LLC of Annapolis, MD. Severn Partners, a Wall Street-directed private equity company, is a Maryland LLC.

4.     Defendant Immediate Response Technologies, Inc. (IRT Inc.) is a Maryland corporation with its principal place of business in Glenn Dale, Maryland. The Maryland Department of Taxation and Assessments identifies IRT Inc. as an active corporation in good standing. The Maryland Registered Agent for IRT Inc. is CSC-Lawyers Incorporating Service Company.

     5.     On February 6, 2014, IRT LLC purchased the assets of IRT Inc. for approximately $4.5 million.

     6.     IRT Inc. and IRT LLC have conducted substantial business in the Commonwealth of Virginia.   Both entities have marketed and sold significant quantities of their products within Virginia, including substantial sales to the Leesburg Police Department in Loudoun County.   In its late-2013 Confidential Information Memorandum (CIM), IRT Inc.



identified Virginia as one of four states (marked in dark blue in the graphic) where the entity did business of more than $1 million.   See the graphic above, which is taken from the CIM (the CIM is described below at ¶¶ 49-51).

     7.     As part of Gen. Hughes' duties as IRT Inc.'s CEO and President he represented IRT Inc. at multiple events ranging from business meetings at the Pentagon (in Arlington, Virginia) to fund-raising events (including events at Belle Haven Country Club) for the Wounded Warrior Project.   In this capacity, Gen. Hughes regularly participated in his job-related duties in events across Northern Virginia.   IRT LLC has continued the multiple and ongoing Virginia contacts.

## Jurisdiction and Venue

8.      There is complete diversity among the parties, and the amount in controversy is greater than $75,000; therefore, this Court has jurisdiction pursuant to 28 USC 1332(a)(1).

9.      Both IRT Inc. and IRT LLC are subject to jurisdiction in Virginia and therefore are residents of Virginia for purposes 28 USC 1391(c)(2).  Venue in this District and Division is proper pursuant to 28 USC 1391(b).

10.     Service of process is made pursuant to FRCP Rule 4(e)(1) and the state service of process statues and rules of Delaware and Maryland.

## Material Facts

**Lt. Gen. Harley A. Hughes (USAF-Ret.)**

11.     Gen. Hughes, an Oklahoma native, is a retired Air Force pilot and senior staff officer.  He served as one of the Air Force's youngest B-52 command pilots, and flew more than 200 combat missions as an F-4 pilot.  He was awarded the Silver Star for heroism in combat and four Distinguished Flying Crosses for his valor.  During his military career his extraordinary service was recognized with 25 Medals for exceptional airmanship.

12.     During his Air Force career, Gen. Hughes developed his management skills with an advanced degree in Management Manpower from the University of Colorado and later studies at the National War College and the Industrial College of the Armed Forces.  He served as the senior conventional and nuclear war planner for the Strategic Air Command.  After promotion to Lieutenant General, he was assigned to the Joint Chiefs of Staff where he was dual-hatted as the Deputy Chief of Staff for Plans and Operations and the Air Force's Operations Deputy.

13.     Gen. Hughes served as a corporate executive in the intelligence arena after retiring from the Air Force.   He moved into consulting, and through his consulting business Gen. Hughes joined the Board of TVI Corporation in 2005.

14.     The National Defense Industrial Association described Gen. Hughes this way:

> Mr. Harley Hughes, Chief Executive Officer of Immediate Response Technologies, Inc. Lt Gen, USAF (Ret.) is one of those rare CEO's that has shown an innate ability to combine lessons learned in decades of senior military leadership with an intuitive grasp of key business operational concepts; while merging them with compassionate and caring employee based programs that daily benefit everyone who works at IRT.

15.     As explained below in ¶¶ 23-27, the TVI Board asked Gen. Hughes to lead the company as its CEO and President after the company's senior officers were indicted and the company was in turmoil.

**The Business of Immediate Response Technologies**

16.     IRT Inc., and now IRT LLC, design and manufacture protection and safety products for use against Chemical-Biological-Radiological-Nuclear (CBRN) hazards.   The IRT products are utilized in CBRN emergency response situations by the Army and Air National Guard, Coast Guard, Department of Justice, Federal Bureau of Investigation, Central Intelligence Agency, the Department of Homeland Security, the Federal Emergency Management Agency, by other federal and state agencies, and by local police departments, including by the Leesburg Police Department in Loudoun County, Virginia.   The products are also sold to friendly foreign governments.   Examples of the business' leading products are given in the paragraphs below.

17.     At least 95% of the company's sales are to the federal government, primarily to the Army and the National Guard.   Demand for CBRN hazard products has been escalating.

Threats of chemical attacks, both internationally and domestically, have increased and will likely continue to escalate. Biological hazards also have increased; the recent outbreak of Ebola in West Africa serves as an example of the need to be prepared to respond internationally and at home to these threats on short notice.

### *Protective Patient Wraps/PAPRs*

18.     IRT Inc., and now IRT LLC, manufacture protective patient wrap systems that utilize powered air purifying respirators (PAPRs). A wrap, which is a sleeping bag-like container that isolates a patient for travel, treatment, and for protection of care-givers, includes the C2A1 filters/canisters described below. As an example, the patient wraps are appropriate for use with victims of chemical attacks as well as for Ebola-infected patients.

### *Gas Mask System Filters/Canisters*

19.     IRT Inc., and now IRT LLC, manufacture the C2A1 filter/canister. The C2A1



C2A1 Filter and Canister

M40/M42 Gas Mask System

filter/canister is a M40/M42 gas mask system (see graphic to the left) component that filters ambient air to the user. Toxic liquid and solid materials are removed from the air via a high efficiency particulate air (HEPA) grade filter media. A bed of activated carbon then removes appropriate gas-phase toxins downstream. The combination of these two filter mechanisms remove all known Chemical/Biological warfare agents, toxins, and radioactive fallout particles.

20.     From 2010-2013, IRT Inc. was the Army's sole supplier of the C2A1 filters and canisters. During this period, the Army purchased as many as 2,500,000 C2A1 filters/canisters

from IRT Inc. IRT Inc.'s past production and sales confirm that its products met the exacting military specifications.

21.     IRT Inc., and now IRT LLC, additionally manufacturer and sell the filter/canister for the Army's M53 gas mask, the eventual replacement for the M40/M42 mask.

### CBRN Enhanced Response Force/Homeland Response Forces Camp

22.     The Department of Defense is now committed to maintaining CBRN Enhanced Responses Forces in 17 states. IRT Inc., and now IRT LLC, manufacture the deployable camp structures which include headquarter and decontamination structures, as shown in the graphic to the right.



### The TVI Corporation Scandal

23.     In 2007, Gen. Hughes was a member of the Board of Directors of TVI, the publicly-traded predecessor company to IRT Inc. A whistleblower investigation revealed a fraudulent financial scheme orchestrated by TVI's President, Executive Vice President, and their outside accountant. The corporate officers were subsequently indicted, pled guilty and then sentenced to prison terms for their crimes.

24.     In late 2007, the TVI Board asked Gen. Hughes to take over as the company's CEO and President. He accepted.

25.     The former officers' fraudulent scheme nearly destroyed TVI. Under Gen. Hughes' direction, the company filed in early 2009 for voluntary reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court in Greenbelt, Maryland. See *In re TVI*

*Corporation et al.*, Case No. 09-15677.  The Bankruptcy Court approved the Reorganization

Plan in December 2009.   Pursuant to the plan, the remaining TVI assets and its subsidiaries were

collected in a new privately-held entity, IRT Inc.

26.      In the TVI bankruptcy as many as 6,000 individuals lost their investments in the

company; Gen. Hughes' 600,000 TVI shares, valued previously at $3.6 million, were worthless

after the bankruptcy.

27.      Under the court-approved Reorganization Plan, IRT Inc. had two classes of stock.

The Preferred Stock was 100% owned by BB&T Bank, TVI's principal creditor.  The IRT Inc.

Executive Team, led by Gen. Hughes, then owned 90% of the company's common stock; Gen.

Hughes personally held approximately 37% of the common stock.  John McMullen, a retired

Army colonel and the company's new Executive Vice President, and Sheri Voelkel, the CFO,

held the balance of the Executive Team's common stock.

**Immediate Response Technologies, Inc. and the Development of the Sales Pipeline**

28.      From 2010-2013, Gen. Hughes and Col. McMullen rebuilt the company out of the

ashes.   IRT Inc. was not only profitable, but was paying off the legacy BB&T debt from the TVI

days as included in the Reorganization Plan approved by the Bankruptcy Court.

29.      During this 4-year period the efforts of Gen. Hughes and Col. McMullen filled a

future sales pipeline with $161 million of high probability sales.  As of October 2013, the Top 5

items on the IRT Inc.'s list of high probability sales included:

| Customer | Program / Project Name | Description | Total Revenue Opportunity [1] |
|---|---|---|---|
| CUSTOMER A | Protective Patent Wrap | Protective Patent Wrap | $36,000,000 |
| CUSTOMER B | C2A1 Filters | C2A1 Filter | 36,000,000 |
| CUSTOMER C | CERFP / HRF Camp | CERFP / HRF Capt - (Qty 5) Systems | 22,070,500 |
| CUSTOMER D | CBRN Guard Kit Upgrade | 200 Kits / Week for 60 Weeks | 5,500,000 |
| CUSTOMER E | 81mm GAMs | Qty (296,138) 81mm Gas Absorbent Modules | 4,500,000 |

The CIM goes on to identify the complete pipeline.

30.     The U.S. military's program for Protective Wraps, described above at ¶ 18, has a federal $36 million budget commitment over four years. This was *before* the most recent Ebola outbreaks in West Africa and fears of domestic outbreaks. As the incumbent provider for Patient Wrap systems, IRT Inc. provided $10 million of these systems in recent years. A follow-on contract is currently in the procurement cycle, with the majority of IRT Inc.'s work for this program bid completed before January 2014.

31.     IRT Inc., as the prior C2A1 filters/canisters supplier to the Army with a demonstrated capability to meet military specifications, was the strong favorite to be awarded the contract to follow from Solicitation No. W56HZV12R0313. IRT Inc. submitted its bid in late-2013. In August 2014, after several delays, the Army awarded the C2A1 filter and canister contract to IRT LLC. At the bid price, the contract has an expected value of $44.96 million.

32.     IRT Inc. also won the contract for the CERFP/HRF Camps program. The program has been budgeted for $22 million, but with increased attention on CBRN response capability the military spending on this program may increase substantially.

33.     In May 2013, the Army awarded IRT Inc. a multi-year contract for the M53 mask system filters/canisters. The M53 mask systems is the selected replacement for the current M40/M42 mask system.

34.     Other products and programs developed and marketed by IRT Inc. from 2010-2013 where there is an existing sales pipeline include the National Guard's $5.5 million powered air respirator upgrade program, and the $4.5 million GAMS program for fabric containers for the 81 MM mortar shells.

---

35. In addition to specific government bid opportunities and contracts, a substantial part of the business' sales have been and continue to be made pursuant to a GSA Schedule contract. Federal buyers, and often state buyers, purchase goods and services under the Schedule contracts terms and prices. IRT Inc., and now IRT LLC, market their products directly to many of their customers (*e.g.*, the National Guard, Coast Guard, Homeland Security, and local police departments). The product purchases, however, are made under the GSA Schedule.

**Gen. Hughes' Written 4-Year Employment Contract**

36. In 2012, as a reward for a job well done and an inducement to Gen. Hughes to continue to lead IRT Inc. and to retain the business' credibility with its government and military customers, the IRT Inc. Board offered Gen. Hughes a written Employment Contract commensurate with his experience, skills, and reputation. The Employment Contract was prepared by IRT Inc.'s representatives, not by Gen. Hughes.

37. The December 8, 2012 Employment Contract carries a 4-year term. That is, the contract was signed in December 2012 and continues through December 2016. A copy of this contract is attached as Exhibit #1 and made part of this Complaint.

38. Compensation under the contract includes a $350,000 base salary, benefits, and defined incentives. The base salary was to increase each year, and salary incentive stated as a percentage of base salary are defined in this way:

| EBITDA * | Annual Base Salary Increase | Annual Base Salary Incentive |
|---|---|---|
| $0 up to $3,000,000 | 5% | 15% |
| $3,000,001 up to $4,000,000 | 10% | 20% |
| $4,000,001 up to $6,000,000 | 15% | 30% |
| Greater than $6,000,000 | 25% | 40% |

Gen. Hughes' annual compensation package was $491,880 in 2013, and was expected to increase in 2014, 2015, and 2016.

39.    The present value of total compensation and benefits due Gen. Hughes under the Employment Contract amounts to $1,331,161.

40.    If Gen. Hughes' employment is terminated without cause with proper notice and under the contract provisions before the end of the 4-year contract term, then a Severance Package defined in Section 4 of the Employment Contract applies. No severance was offered or paid to Gen. Hughes. The Severance Package has a current value of $740,132.

41.    The Employment Contract expressly continues in effect "for all purposes" if the company is sold, including sold as an asset sale. Section 8 provides, in part:

> Any such successor of the Company will be deemed substituted for the Company under the terms of this Agreement for all purposes. For this purpose, "successor" means any person, firm, corporation, or other business entity which at any time, whether by purchase, merger, or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Company.

42.    As added protection for Gen. Hughes, the Employment Contract provides, also in Section 8, that "[a]ny other attempted assignment, transfer, conveyance, or other disposition of Executive's right to compensation or other benefits *will be null and void*." (Emphasis added.)

43.    Under these explicit terms, when IRT LLC purchased the assets of IRT Inc. in late February 2014, IRT LLC was substituted for IRT Inc. "for all purposes" in the Employment Contract such that the contract is binding on IRT LLC, and efforts to subvert or avoid the Employment Contract terms are null and void. In sum, the terms of the Employment Contract apply to IRT LLC.

---

**Federal Budget Sequestration and the Sale of IRT Inc.**

44.     Under the federal budget sequestration in 2013 automatic spending cuts were imposed.   The cuts are split between the defense and non-defense categories, with some major programs like Social Security, Medicaid, federal pensions, and veteran's benefits exempted. Notably, Department of Defense expenditures were not exempted.

45.     As a result of sequestration, IRT Inc.'s federal sales suffered in 2013.   Demand for IRT Inc.'s products, however, remained—the sales were not so much lost as they were deferred.

46.     In August 2013, BB&T notified IRT Inc. that certain loan covenants, described as relatively insignificant, had been violated.   As the principal creditor, BB&T directed that the company be sold.  BB&T had previously been supportive of IRT Inc. and the Executive Team. But after reorganizations within the bank, oversight of IRT Inc. was assigned to a Tampa, FL monitor.  For unexplained reasons, Bruce McDonald, the new monitor, pushed for the sale of IRT Inc.

47.     BB&T recommended that IRT Inc. hire the Livingstone Group from Chicago as the broker to manage the sale of the company.   IRT Inc. retained Livingstone in late August for a fixed fee plus out-of-pocket expenses.

48.     The two lawyers who had represented TVI and then IRT Inc. in the earlier bankruptcy returned to represent the company in the sale.  Joel Walker and Jeffrey Spears, from Duane Morris LLP's Pittsburgh office, entered the negotiations advising IRT Inc. and also advising Gen. Hughes and the other members of the Executive Team.   BB&T approved the Walker/Spears hiring.

49.     Livingstone set about preparing a Confidential Information Memorandum (CIM) that described IRT Inc.'s business and finances. The CIM was ready for distribution in early October 2013. The document not only summarized IRT Inc.'s business and financial history, but also provided supported revenue and earnings forecasts through 2017. The Livingstone analysts examined the business' products and the associated escalating demand for those products, and considered the sequestration effects.

50.     The Livingstone forecasts in the CIM recognized the continued demand for the IRT products and that sales were deferred, not lost, from the sequestration. The CIM analysts concluded in the Executive Summary:

> As a result of sequestration, some of IRT's anticipated purchase orders for expected contracts have been pushed back from 2013 for 2014.

Continuing, the CIM reads:

> The sequester will have limited long-term impact on the company's revenue and profitability given the importance placed on CBRN protection by the Department of Defense.

51.     The CIM forecasts net sales of $161.6 million for 2014-2017 as shown below:

| ($ in thousands) | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast |
| Net Sales | $30,174 | $36,812 | $43,806 | $50,815 |
| % Growth | 104.7% | 22.0% | 19.0% | 16.0% |

The CIM forecasts are supported by references to specific awarded contracts and pending bids, and analysis of the demand for the CBRN response products.

52.     Based on the Livingstone CIM analysis, including the revenue forecasts, IRT Inc. was worth $20 million to $26.4 million (based on an Income Approach valuation) before subtracting the remaining BB&T debt.

53.     Livingstone quickly identified an Annapolis-based entity (which was later identified as Severn Partners) as a prospective buyer, and boasted to IRT Inc. that Livingstone could bring this buyer to the table "within a week." A flash sale was rejected, however, in favor of a structured bidding process.

54.     Severn Partners sent representatives to IRT Inc.  The representatives spent multiple weeks in the IRT Inc. conference room reviewing IRT Inc.'s operations, finances, and contracts. Included among the contracts that were made available was Gen. Hughes' Employment Contract.

55.     Severn Partners' "cash free/debt free" bid was for approximately $5 million, between $15 million and $21.4 million below the business' value. The eventual purchase price was even $500,000 lower.

56.     Another bidder, ILC Dover, LP, bid higher, and suggested in talks that it would pay substantially more. ILC Dover is best known as the manufacturer of NASA's spacesuits. The company produces its own line of respirators, and manufactures the M40/42 gas masks that use the C2A1 filters. But Livingstone cut off the bidding and advocated for the Severn Partners' bid. BB&T approved.

57.     On February 6, 2014, IRT LLC, a newly formed Delaware LLC wholly-owned by Severn Partners, bought the IRT Inc. assets for $4.5 million. As part of the sales agreement, 10% of the purchase price was to be held back for 12 months. IRT Inc. subsequently novated its

contracts and outstanding contract bids, including its bid on the Army C2A1 contract, to IRT LLC.

**False Assurances and Hollow Promises to Gen. Hughes**

58.     From the beginning of the sale process back in October 2013, Gen. Hughes was assured by Severn Partners and IRT LLC that he would be continued as the CEO and President and that his full compensation deal would be honored.  The assurances were at times direct, and at times made by Severn Partners to the Duane Morris lawyers.

59.     After the purchase price was revealed, and Gen. Hughes was greatly concerned about the fire sale price.  But BB&T was apparently willing to accept the low price, and Gen. Hughes was assured by the anxious buyer that he and the members of his Executive Team would nonetheless have the opportunity to receive the benefits from their successful, multi-year effort to rebuild the business by earning fees tied to the $161 million sales pipeline.

60.     Joe Duffy is the Chairman of IRT LLC.  Duffy had been on the Board of TVI.  But was not associated with IRT Inc.   On information and belief, Duffy advised Severn Partners about IRT Inc.'s business and strongly encouraged Severn Partners to buy the business.  As Severn Partners began its due diligence, Tom Ripley, a member of Severn Partners, identified Duffy to Gen. Hughes as the future chairman and sent Duffy to IRT Inc. to conduct part of the due diligence.

61.     Fairly early in the due diligence process, after a presentation to Severn Partners that highlighted the IRT Inc. products and sales pipeline, Frank Gren, a Wall Street veteran and the chairman of Severn Partners, exclaimed to Gen. Hughes, "we have got to get this company."

62. Duffy repeatedly met with Gen. Hughes and others at IRT Inc. from mid-October 2013 into January 2014. At each opportunity, Duffy assured Gen. Hughes that he and the others on the Executive Team would be retained. Duffy told Gen. Hughes that "the new company could not succeed without [Gen. Hughes'] leadership in bringing the company to full operating capacity and fulfilling the pipeline."

63. Severn Partners submitted its Letter of Intent in early January 2014. Gen. Hughes was first encouraged to sign an agreement binding IRT Inc. to a sale to IRT LLC. When Gen. Hughes balked at signing, primarily because of the fire sale price and tentative status of the Executive Team retention, Severn Partners and Duffy continued their inducements—they really needed Gen. Hughes to sign and to lend his support to the purchase and transition. The inducement came as representations that Gen. Hughes would earn fees from the sales pipeline. At first, the representations were that Gen. Hughes and the other Executive Team members would all earn the sales pipeline fees.

64. On or about January 21, 2014, Gen. Hughes signed the first of the necessary sale papers on behalf of IRT Inc.

65. Two days later, Tom Ripley, a member of Severn Partners and an IRT LLC Board member, Joe Duffy, the chairman of IRT LLC, and Coleman Ruiz, the newly identified president of IRT LLC, stepped into Gen. Hughes' office at around 11:00 a.m. In a meeting that lasted no more than 15 minutes, they told Gen. Hughes for the first time that he would not be the CEO and President of the business. He would continue as a member of the Board. There was no mention of the existing 4-year Employment Contract or the Severance Package.

66.     Gen. Hughes was stunned.   The earlier representations by IRT LLC's representatives, including its chairman and Board members, to Gen. Hughes that he would be retained as the CEO and President and that he would continue be paid as provided for in his Employment Contract were revealed to be false when made.

67.     IRT LLC still needed Gen. Hughes.   The other members of the Executive Team were being retained (Col. McMullen continued as the Executive VP; his employment was terminated in mid-2014; Sheri Voelkel is still the CFO).   Only Gen. Hughes was pushed out. Speaking for IRT LLC, Duffy repeated to Gen. Hughes the earlier inducements of fees tied to the sales pipeline, this time, however, there was no mention of the two other Executive Team members.   Duffy made reference to standard fees; these range from 5% down to 2½% of revenues.   For example, on a given contract for each year the fee would be 5% on the first $100,000 of revenues and 2½% of the remainder of the revenue for that contract for the year.

68.     Relying on Duffy's representations, Gen. Hughes did what was asked.   Over the next two weeks he signed the necessary sales papers on behalf of IRT Inc. and he cooperated with the transition to IRT LLC.

**The Ruby Tuesday Deceit**

69.     A couple weeks later, Duffy sent Gen. Hughes an email advising him of the first post-sale Board meeting on February 25, 2014.   Then, several days before the Board meeting, Duffy called to set a quick meeting with Gen. Hughes before the Board convened.   Gen. Hughes agreed to meet Duffy at the Ruby Tuesday restaurant on Greenbelt Road in the late morning. Duffy explained only that he had some pre-meeting issues to cover.

70.     On Tuesday morning, February 25th, Gen. Hughes arrived at Ruby Tuesday first. Seated by the restaurant's front window, he saw Duffy's Lexus pull into the parking lot. Duffy, appearing nervous and harried, sat down across from Gen. Hughes. Duffy then curtly explained that he needed Gen. Hughes' signature for some "minor" modifications to his Board membership agreement. Gen. Hughes could either sign or he was off the Board and out as a consultant. The signing was necessary right away because, as Duffy explained, he had to hurry to the Board meeting. Duffy added that Gen. Hughes was excused from the meeting—Gen. Hughes understood this to be a late-delivered message that he was neither expected nor wanted at the meeting.

71.     Duffy had a single signature page with him—the page had the signature of Coleman Ruiz, the newly-named President of IRT LLC, and a line for Gen. Hughes' signature. Gen. Hughes hesitated, but Duffy again assured him that the changes were only "minor." Gen. Hughes signed. Duffy left without leaving any documents, not even a copy of the Ruby Tuesday signature page.

72.     The next time Gen. Hughes saw the Ruby Tuesday signature page it was at the end of a 7-page contract document. Call this the Ruby Tuesday Deceit document. Curiously, the pages in the document are mostly numbered, but the Ruby Tuesday signature page is not. The terms of this document were not "minor" changes to Gen. Hughes' Board membership terms, as Duffy had represented, but would essentially strip Gen. Hughes of the Employment Contract compensation and also erase the promises of fees from the sales pipeline and more.

73.     Gen. Hughes provided additional consulting services associated with the transition to IRT LLC. But shortly after the Army's $44.96 million award to IRT LLC for the C2A1 filters/canisters contract, IRT LLC ended the arrangement.

74.     The earlier representations by IRT LLC's chairman to Gen. Hughes that he would earn fees from the substantial sales pipeline proved to be false when made.

**Gen. Hughes' Financial Losses**

75.     Gen. Hughes' 600,000 shares of TVI stock was valued at $3.5 million before the company's troubles associated with the prior officers' fraud.   In the related 2009 bankruptcy, the stock was rendered worthless.

76.     The present value of the fees from the sales pipeline percentages promised to Gen. Hughes add to $3,172,524.

77.     The December 2012 Employment Contract includes a base compensation formula and sets incentives and benefits. From January 29, 2014, the day Gen. Hughes was told by IRT LLC that he would not be continued as the CEO and President, to December 2016, the present value of the unpaid contract value amounts to $1,331,161.

78.     If Gen. Hughes' employment is terminated with proper notice and consistent with the Employment Contract terms, then he will be owed the Severance sums specified in the agreement.

**IRT LLC's Enrichment**

79.     As shown in the CIM, the IRT LLC business revenues from 2014-2017 will likely exceed $161,000,000, and profits for the same period (adjusted EDITDA) will approach $18 million.   This is from the IRT Inc. high probability $161 million sales pipeline for which IRT

LLC paid only $4.5 million. IRT LLC has been enriched by at least $15.5 million beyond what it paid for the business.

## Count 1

## Fraud Claim Against IRT LLC

80.     Plaintiff repeats and realleges the allegations made in paragraphs 1 through 79 above.

81.     IRT LLC, through its representatives Joe Duffy and Tom Ripley, falsely and intentionally represented to Gen. Hughes that (1) IRT LLC would retain Gen. Hughes (and the Executive Team), (2) IRT LLC would continue to pay him as specified in his Employment Contract, and (3) IRT LLC would provide Gen. Hughes with a fair part (from 5% down to 2½ %) of the revenues from the IRT Inc. sales pipeline.

82.     The false representations were made to Gen. Hughes to defraud him, and more specifically to induce him to accept on behalf of IRT Inc., the Severn Partners' offer and to sign the necessary legal papers for the sale of IRT Inc. and to cooperate through the transition.

83.     Gen. Hughes reasonably and justifiably relied upon the false representations. He signed the necessary legal papers in his capacity as CEO and President of IRT Inc. and he cooperated as requested.   IRT LLC did not retain Gen. Hughes, it did not pay him as specified in the Employment Contract, and it closed off any opportunity for him to receive fees from the sales pipeline.

84.     As a result, Gen. Hughes has been damaged in an amount greater than $75,000.

85.     IRT LLC's conduct as described shows both actual malice and the wanton or reckless disregard for the rights of Gen. Hughes, which supports an award of punitive damages.

## Count 2

### Constructive Fraud Claim Against IRT LLC

86.     Plaintiff repeats and realleges the allegations made in paragraphs 1 through 85 above.

87.     IRT LLC, through its representatives Joe Duffy and Tom Ripley, falsely and intentionally represented to Gen. Hughes that (1) IRT LLC would retain Gen. Hughes (and the Executive Team), (2) IRT LLC would continue to pay him as specified in his Employment Contract, and (3) IRT LLC would provide Gen. Hughes with a fair part (from 5% down to 2½ %) of the revenues from the IRT Inc. sales pipeline.

88.     The false representations were made to Gen. Hughes to induce him to accept on behalf of IRT Inc. the Severn Partners' offer and to sign the necessary legal papers for the sale of IRT Inc. and to cooperate through the transition.

89.     Gen. Hughes reasonably and justifiably relied upon the false representations.  He signed the necessary legal papers in his capacity as CEO and President of IRT Inc. and he cooperated as requested.   IRT LLC did not retain Gen. Hughes, it did not pay him as specified in the Employment Contract, and it closed off any opportunity for him to receive fees from the sales pipeline.

90.     As a result, Gen. Hughes has been damaged by the constructive fraud described in this Court in an amount greater than $75,000.

## Count 3

### The Ruby Tuesday Deceit—Fraudulent Inducement

91. Plaintiff repeats and realleges the allegations made in paragraphs 1 through 90 above.

92. IRT LLC obtained Gen. Hughes' signature on what is termed the Ruby Tuesday Deceit by falsely representing the purposes of the signature page and by failing to reveal to Gen. Hughes the intention to append the page to a "contract" that was not shown to or discussed with Gen. Hughes.

93. Gen. Hughes' signature on the Ruby Tuesday Deceit was fraudulently obtained and must be deemed void and of no consequence.

94. Alternatively, the terms of the Ruby Tuesday Deceit would substantially alter, and indeed terminate, Gen. Hughes' Employment Contract rights and compensation. Under the terms of the Employment Contract, which IRT Inc. and IRT LLC are parties, the Ruby Tuesday Deceit should be declared null and void.

95. As a result, Gen. Hughes has been damaged by the Ruby Tuesday Deceit in an amount greater than $75,000.

96. IRT LLC's conduct as described shows both actual malice and the wanton or reckless disregard for the rights of Gen. Hughes, which supports an award of punitive damages.

## Count 4

### Breach of the 4-Year Employment Contract Claim
### Against IRT Inc. and IRT LLC

97.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 96 above.

98.    Gen. Hughes and IRT Inc. are parties to the December 2012 Employment Contract.

99.    In February 2014, under the terms of the contract, IRT LLC was substituted for IRT Inc. in the contract, and thus IRT LLC is bound to the contract.

100.    IRT Inc. remains obligated under the terms of the contract.

101.    The contract has not been terminated and Gen. Hughes remains ready, willing and able to perform his duties under the contract.

102.    Since February 6, 2014, IRT Inc. and IRT LLC have breached the contract by failing to pay Gen. Hughes according to Section 3 and possibly also Section 4 of the Contract.

103.    Gen. Hughes is damaged by IRT Inc.'s and IRT LLC's failing to pay him according to the terms of the contract.  The damages are the total compensation, including incentives and benefits provided for in the contract through December 2016.

104.    Gen. Hughes' damages from the breach of contract described in this Count are greater than $75,000.

**Count 5**

**Claim Under MD LABOR & EMPLY § 3-507.2 Against IRT Inc. and IRT LLC
Failure to Pay Severance**

105.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 104 above.

106.    Gen. Hughes and IRT Inc. are parties to the December 2012 Employment Contract.

107.    In February 2014, under the terms of the contract, IRT LLC was substituted for IRT Inc. in the contract, and thus IRT LLC is bound to the contract.

108.    Gen. Hughes' termination as the CEO and President of the business was without cause.

109.    If it is determined that IRT Inc. and IRT LLC terminated Gen. Hughes' employment under the Employment Contract, then the Section 4 Severance Package terms of the contract apply.

110.    IRT Inc. and IRT LLC have failed to pay Gen. Hughes in compliance with the Section 4 Severance Package. The failure to pay the full Severance was not the result of a *bona fide* dispute.

111.    Gen. Hughes is due the full Severance Package under the Employment Contract, a sum greater than $75,000, with the value trebled pursuant to MD LABOR & EMPLY § 3-507.2, plus reasonable attorneys' fees and costs.

## Count 6

### Unjust Enrichment Claim Against IRT LLC

112.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 110 above.

113.    Gen. Hughes' eventual signing of the Asset Sales Agreement and his cooperation in the transition conferred a substantial benefit on IRT LLC.

114.    IRT LLC fully understood and appreciated both the fact and the extent of the benefits of Asset Sales Agreement without making good on its promises and representations made to Gen. Hughes.

115.    It is unfair and inequitable for IRT LLC to retain the benefits described above without it paying for those benefits as it represented it would.

116.    As a result, IRT LLC has been unjustly enriched in an amount greater than $75,000.

### Relief Requested

117.    For Count 1, Actual Fraud Breach Claim against IRT LLC, Gen Hughes seeks damages of no less than $3,172,524. plus punitive damages of $1,500,000.

118.    For Count 2, Constructive Fraud Claim against IRT LLC, Gen. Hughes seeks damages of no less than $3,172,524.

119.    For Count 3, the Ruby Tuesday Deceit, the Ruby Tuesday "Contract" be declared void and of no consequence as it was fraudulently procured, and for damages in an amount be determined.  For the fraudulent conduct, Gen. Hughes seeks punitive damages of $500,000.

---

120. Alternatively, the Ruby Tuesday "Contract" be declared null and void under the terms of the Employment Contract.

121. For Count 4, Breach of Contract Claim against IRT LLC, Gen Hughes seeks damages of no less than $1,331,161.

122. For Count 5, Gen. Hughes seeks the full Severance Terms of the Employment Contract, which are approximately $740,132, with the sum trebled to $2,220,396 pursuant to MD LABOR & EMPLY § 3-507.2, plus reasonable attorneys' fees and other costs as provided for by the statute.

123. For Count 6 Unjust Enrichment Claim against IRT LLC, Gen. Hughes seeks damages of an amount to be determined based on the value of the business less the IRT LLC $4.5 million purchase price.

124. On all Counts, Gen. Hughes asks this Court to awards statutory costs plus all such other relief that this Court deems just and proper.

<strong>Jury Demand</strong>

125. Plaintiff demands trial by jury on all Counts of his Complaint.

Respectfully submitted,

Harley A. Hughes
By Counsel

James S. Kurz (VSB #16610)
Virginia Whitner Hoptman (VSB #65565)
Daniel D. Mauler (VSB #73190)
Jacquelyn A. Jones (VSB #82261)

<strong>Complaint of Harley A. Hughes</strong>

**REDMON PEYTON & BRASWELL LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph: (703) 684-2000
JKurz@RPB-law.com
DMauler@RPB-law.com
JJones@RPB-law.com


James S. Kurz, Virginia Whitner Hoptman, Daniel D. Mauler, and Jacquelyn A. Jones are

members in good standing of the bar of this Court.

James S. Kurz