IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

HARLEY A. HUGHES,                      )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )        1:14-cv-1699 (LMB/IDD)
                                       )
IMMEDIATE RESPONSE TECHNOLOGIES,       )
     LLC, and IMMEDIATE RESPONSE       )
     TECHNOLOGIES, INC.,               )
                                       )
          Defendants.                  )

MEMORANDUM OPINION

Before the Court is Plaintiff's Motion for Reconsideration, which asks the Court to

reconsider its March 13, 2015, ruling on defendant Immediate Response Technologies, LLC's

("IRT LLC") two motions for summary judgment. In that ruling, summary judgment was

granted on all eight counts in plaintiff's Amended Complaint; however, in the pending Motion

for Reconsideration, plaintiff contests the ruling only as to Counts 1, 2, 3, 4, and 8. Defendant

IRT LLC has opposed plaintiff's motion and, for the reasons that follow and those stated from

the bench, Plaintiff's Motion for Reconsideration will be denied.[1]

## I.   BACKGROUND

Plaintiff Harley A. Hughes ("Hughes" or "plaintiff") is a retired three-star Air Force

general and an experienced businessman.[2] In 2005, he joined the board of directors of a

---

[1] The remaining defendant, Immediate Response Technologies, Inc., has neither answered nor
appeared in this action and is currently in default.

[2] In his Amended Complaint, plaintiff describes his extensive military and business background.
"During his Air Force career, General Hughes developed his management skills with an
advanced degree in Management Manpower from the University of Colorado and later studie[d]

publicly-traded company called TVI Corporation ("TVI").  Am. Compl. ¶ 13.  In 2007,

following the removal of TVI's president and executive vice president for perpetrating a

fraudulent financial scheme, the TVI board offered Hughes the positions of President and Chief

Executive Officer ("CEO"), which Hughes accepted.  Id. ¶¶ 23-24.  Due to the fallout from the

former officers' fraudulent scheme, TVI was suffering financially, causing it to file for voluntary

reorganization under Chapter 11 of the Bankruptcy Code in 2009.  Id. ¶ 25.  Pursuant to the

reorganization plan, the remaining TVI assets were collected into a new, privately-held entity

called Immediate Response Technologies, Inc. ("IRT Inc.").  Id.  Under the reorganization plan,

IRT Inc. had two classes of stock.  Id. ¶ 27.  The preferred stock was 100% owned by BB&T

Bank ("BB&T"), TVI's principal creditor.  Id.  The IRT Inc. executive team—which consisted of

Hughes as President and CEO, John McMullen ("McMullen") as Executive Vice President, and

Sheri Voelkel ("Voelkel") as Chief Financial Officer—collectively owned 90% of the

company's common stock, with Hughes personally holding 37% of the common stock.  Id.

---

at the National War College and the Industrial College of the Armed Forces. . . . After promotion
to Lieutenant General, he was assigned to the Pentagon where he was dual-hatted as the Deputy
Chief of Staff for Plans and Operations and the Air Force's Operations Deputy." Am. Compl.
¶ 12.  After retiring from the Air Force, Hughes "served as a corporate executive in the
intelligence arena." Id. ¶ 13.  "He moved into consulting, and through his consulting business
General Hughes joined the Board of TVI Corporation in 2005." Id.  The National Defense
Industrial Association has described Hughes as "one of those rare CEO's that has shown an
innate ability to combine lessons learned in decades of senior military leadership with an
intuitive grasp of key business operational concepts." Id. ¶ 14.

> In addition, Hughes highlighted his business savvy in an e-mail on February 26, 2014:

> I have been more than instrumental in positioning the Corporation to achieve an
> enormous degree of growth during 2014 and beyond.  I was also key in
> TACOM's decision to advance C2-A1 by a full quarter which will provide IRT,
> LLC with a full quarter's worth of revenue that would not have been the case as
> the old schedule dictated.

This e-mail is attached as Exhibit B-9 to IRT LLC's Memorandum in Support of Its Motion for
Summary Judgment ("IRT LLC's First Summary Judgment Brief") [Dkt. No. 19] and is cited as
"Ex. B-9" hereinafter.

Hughes, McMullen, and Voelkel were the only three voting shareholders of IRT Inc.  See Ripley Aff.[3] ¶ 14.

From 2010 to 2012, IRT Inc. experienced average annual revenues of $23.2 million.  See id. ¶ 17.  On December 8, 2012, as the executive team's employment contracts were coming to an end, IRT Inc. offered new employment contracts to Hughes, McMullen, and Voelkel.  Am. Compl. ¶ 37.  Hughes' new contract (the "December 2012 Employment Contract") was a four-year contract that included compensation consisting of a $350,000 base salary, which would increase each year, plus benefits and defined incentives.[4]  Id. ¶ 39.  Under that contract, Hughes' total compensation came to $491,880 for 2013 and he expected it to increase for each of 2014, 2015, and 2016.  Id. ¶ 39.  The agreement also included a severance package that Hughes would receive if he were terminated without cause before the end of the contract term.  Id. ¶ 41.  None of the executive team's new employment agreements were provided to BB&T when they were awarded.  See Ripley Aff. ¶ 15.

From 2012 to 2013, IRT Inc.'s sales dropped from $24 million to $12 million.  Am. Compl. ¶ 46; Ripley Aff. ¶ 18.  Hughes attributes that drop to the federal budget sequestration in 2013.  Am. Compl. ¶ 46.  The company's financial difficulties caused IRT Inc. to violate certain loan covenants with BB&T in August 2013.  Id. ¶ 47.  As a result, BB&T, IRT Inc.'s principal creditor, directed that the company be sold.  Id.  Severn Partners, LLC ("Severn") was approached in late 2013 as a possible investor to purchase IRT Inc.'s assets.  Id. ¶ 54; Ripley Aff. ¶ 23.  Severn representatives spent weeks reviewing IRT Inc.'s operations, finances, and

---

[3] "Ripley Aff." refers to the affidavit of Thomas H. Ripley, which is attached as Exhibit A to IRT LLC's First Summary Judgment Brief.  Ripley is a 50% owner and Managing Member of Severn Partners, LLC, which holds a 75% interest in Immediate Response Technologies Holdings, which is the sole member of defendant IRT LLC.  Ripley Aff. ¶¶ 1-3.

[4] Hughes' December 2012 Employment Contract is attached as Exhibit 4 to his opposition to summary judgment [Dkt. No. 34].

contracts. Am. Compl. ¶ 55. From mid-October 2013 through January 2014, Joe Duffy

("Duffy"), future chairman of IRT LLC and a former board member of TVI, aided in Severn's

assessment of IRT Inc. Id. ¶ 61. He repeatedly met with Hughes and others at IRT Inc. Id. ¶ 64.

Hughes alleges that at "each opportunity" Duffy assured him that he and the other executive

team members would be retained after the sale of the company. Id. ¶ 64; see also id. ¶ 59

(alleging that Severn and IRT LLC assured Hughes from the beginning of the sale process in late

2013 that he would be continued as the President and CEO and that his full compensation deal,

including his December 2012 Employment Contract and severance package, would be honored).

Following its initial assessment, Severn, through its counsel Dickstein Shapiro LLP,

submitted a non-binding Letter of Intent ("LOI")[5] to IRT Inc. on January 7, 2014, proposing an

Asset Purchase Agreement ("APA"), with soon-to-be-formed entity IRT LLC as the buyer,

which would be backed financially by Severn. Ripley Aff. ¶¶ 23-27. Hughes alleges that he was

"greatly concerned" by the proposed purchase price of $5 million described in the Letter of

Intent, which he felt was far below the value of the company and would render his common

stock in the company worthless; however, he also alleges that "BB&T was apparently willing to

accept the low price, and pushed for the sale at that price." Am. Compl. ¶ 60. Hughes further

alleges that he was again assured "that he and the members of his Executive Team would not

only be retained in their management positions but would . . . earn[] fees tied to the $161 million

sales pipeline."[6] Id.; see also id. ¶ 65 (specifying that Duffy made the representation regarding

the sales pipeline revenue). Based on these alleged assurances, Hughes signed the Letter of

---

[5] The Letter of Intent is attached as Exhibit A-1 to IRT LLC's First Summary Judgment Brief.

[6] The $161 million figure comes from a confidential information memorandum ("CIM"), attached as Exhibit 5 to Hughes' opposition to summary judgment [Dkt. No. 34], that was prepared by the brokerage firm aiding in the sale of IRT Inc. The figure is comprised of the projected revenue of IRT Inc. for 2014 through 2017. See CIM 49.

Intent on behalf of IRT Inc. in his capacity as President and CEO.  Although Hughes asserts that

these assurances were referenced in the Letter of Intent that he signed, id. ¶ 59, that letter only

says, with respect to the senior executives, that "[s]ubject to its ongoing due diligence review,

Buyer [IRT LLC] expects to enter into mutually satisfactory arrangements with the senior

executives of the Company [IRT Inc.] related to their involvement with the Buyer after the

Closing Date." LOI § 1(g).

　　　IRT Inc. retained Duane Morris LLP to represent it throughout the APA process.  Ripley

Aff. ¶ 25.  According to the original Complaint, Duane Morris "entered the negotiations advising

IRT Inc. and also advising Gen. Hughes and the other members of the Executive Team."  Compl.

¶ 48.  In contrast to that allegation in his original Complaint, Hughes avers in his affidavit that he

"was not represented by counsel during this entire process" and that "[t]he IRT [Inc.] lawyers

were not my counsel (except that from time to time they provide [sic] legal advice to Col.

McMullen and to me)."  Hughes Aff.[7] ¶ 38.  Also in contrast with much documentary evidence,

Hughes avers that he "had no role in the preparation of the APA documents, and indeed never

saw the entire set of APA documents," id. ¶ 37; however, numerous e-mails show that he was

actively involved in the APA process.[8]  For example, on January 15, 2014, Joel Walker

("Walker"), the main Duane Morris attorney representing IRT Inc. through the transition period,

e-mailed a draft of the APA to Hughes, Voelkel, and McMullen (the other two members of IRT

Inc.'s executive team), among others, and asked them when they would be available to discuss

the draft.  See Ex. D-2.  Two days later, Walker sent a revised version of the APA to Hughes and

the others on the IRT Inc. executive team, asking them to inform him of any comments or

---

[7] Hughes' affidavit is attached as Exhibit 1 to Hughes' opposition brief [Dkt. No. 34].

[8] These e-mails are attached as Exhibits D-1 through D-14 to IRT LLC's Memorandum in
Support of Second Motion for Summary Judgment and Response to Plaintiff's Opposition [Dkt.
No. 48] and cited as "Ex. D-___."

questions they might have. See Ex. D-3. That e-mail also included answers to questions the IRT executive team had apparently asked Walker the day before. See id. Such e-mails continued to be sent between Hughes and counsel for IRT Inc. through the completion of the APA process.

Around January 23, 2014, Thomas Ripley, a member of IRT LLC's board and a member of Severn, as well as Joe Duffy and Coleman Ruiz, met with Hughes to inform him that he would not remain on as the President and CEO of IRT LLC but that he would continue as a member of the board, that Coleman Ruiz would take over as President and CEO of IRT LLC, and that Voelkel and McMullen would be retained in their positions. Id. ¶¶ 66, 68. Hughes alleges that Duffy repeated the earlier inducement that Hughes would receive "fees tied to the sales pipeline" and "made reference to standard fees and the Lehman Formula."[9] Id. ¶ 68. In his affidavit, Hughes admits that there was "no mention in [this] meeting of [his] existing Employment Contract or the Severance Package," Hughes Aff. ¶ 33, and he concedes understanding that IRT LLC did not intend to assume those liabilities:

> I was stunned by the announcement. The earlier representations by [IRT] LLC's representatives, including its chairman and Board members, were that I would be retained as the CEO and President and that I would continue to be paid as provided for in his [sic] [December 2012] Employment Contract. It seemed to me that these promises were false.

Id. ¶ 34. Shortly thereafter, he left the IRT office as of January 30, 2014. Id. ¶ 36.

Although he was no longer physically present at IRT Inc., Hughes continued to participate in the APA process, which was nearing its conclusion. On January 30, 2014, he received an e-mail summarizing the main terms of the proposed final transaction, including the $4.5 million cash purchase price. See Ex. D-6. On Friday, January 31, 2014, Walker e-mailed

---

[9] Under this formula, "on a given contract for each year the fee would be 5% on the first $100,000 of revenues and 2.5% of the remainder of the revenue for that contract for the year." Am. Compl. ¶ 68.

6

Hughes, Voelkel, and McMullen another revised version of the APA, which he asked them to review and to provide comments. See Ex. D-8.

The morning of February 5, 2014, Walker e-mailed Hughes the latest draft of the APA. In that e-mail, Walker indicated he "would like to walk through [it] with [Hughes] later this morning and address any other issues," to which Hughes responded, "Roger that." See Ex. D-9. Hughes returned to the office later that day to sign the APA and related documents in preparation for the closing, see Hughes Aff. ¶ 37, which was scheduled to take place on February 6, 2014. APA § 1.5.[10] Throughout the day, Walker sent Hughes multiple e-mails containing copies of the APA and related documents and asked him to sign their respective signature pages. See Exs. D-10 to D-14. In the last e-mail of February 5, Jeffrey Spear, another Duane Morris attorney, asked Hughes and Voelkel to "[p]lease call" him if they had any questions. See Ex. D-14. There is no evidence in the record that Hughes called Spear. Instead, Hughes proceeded to execute the APA and related documents on behalf of IRT Inc. as its President and CEO.[11] Additionally, Hughes signed his approval of the APA deal as a voting shareholder and as a director of IRT Inc.[12]

Under the final version of the APA, IRT LLC agreed to purchase substantially all of IRT Inc.'s assets for $4.5 million. See APA §§ 1.1, 1.2, 2.1. The APA expressly excluded from the purchase the majority of IRT Inc.'s liabilities, including Hughes' December 2012 Employment

---

[10] The APA is attached as Exhibit B-2 to IRT LLC's First Summary Judgment Brief; however, an amended version of Exhibit B-2 was later filed [Dkt. No. 55].

[11] These documents are attached as Exhibits B-2 through B-5 to IRT LLC's First Summary Judgment Brief.

[12] These documents are attached as Exhibits B-4 and B-5 to IRT LLC's First Summary Judgment Brief.

Contract. See APA § 6.6(d) and Schedule 1.1(c).[13]  Instead, the APA provided that IRT LLC

"shall offer employment to the Senior Executives on the terms set forth in offer letters provided

to each of the Senior Executives prior to Closing."[14]  APA § 6.6(a).  One of the documents

Hughes signed in connection with the closing of the APA was the "Written Consent of [IRT

LLC's] Board of Managers,"[15] which provided, among other things:

> Employment Offer Letters
> RESOLVED, that the form, terms and provisions of . . . the Offer Letter between
> the Company and Harley Hughes (the "Hughes Offer Letter") . . . [along with the
> Offer Letters for the other executives] substantially in the form reviewed by the
> Board, be, and they hereby are adopted and approved in all respects.

Hughes' offer letter took the form of a consulting engagement letter ("Consulting

Agreement"), which Hughes signed in his personal capacity on February 5, 2014, following his

execution of the APA documents.[16]  Hughes asserts he "was asked to sign a signature page

which [he] was told would include the Board member understanding and would set consulting

---

[13] Specifically, the APA stated:

> The parties acknowledge and agree that it is their intention that, except for the
> employment contracts with the Senior Executives, all existing Contracts of non-
> competition, nondisclosure and assignments of invention, between Seller, on the
> one hand, and any Employee or any independent contractor on the other hand,
> providing services to Seller in respect of the Business as of immediately prior to
> the Closing Date shall be transferred to or assumed by Buyer as a result of the
> transactions described herein and that such Contracts shall constitute Assumed
> Agreements hereunder.

APA § 6.6 (d) (emphasis added).  Further, Schedule 1.1(c) set forth the "Assumed Agreements,"
which included "[a]ll Contracts set forth on Schedule 3.11(a), except the following Contracts: . . .
Executive Employment Agreement dated December 8, 2012, by and between Seller and Harley
A. Hughes."  APA, Schedule 1.1(c).

[14] The term "Senior Executives" is defined to include Hughes.  See APA, at Annex I.

[15] This document is included in Exhibit B-6 of IRT LLC's First Summary Judgment Brief.

[16] Although Hughes dated his signature as February 6, 2014, he alleges that he signed this
document on February 5 after signing the APA and related documents.  Am. Compl. ¶¶ 70-71.
In addition, a February 6, 2014, e-mail from Duane Morris attorney Joel Walker to Dickstein
Shapiro attorney Jennifer Wadley indicates that "Hughes signed [the signature page of his offer
letter] and gave it to Joe Duffy yesterday."  IRT LLC's First Summ. J. Br., Ex. C-2, at 2.

terms." Hughes Aff. ¶ 39. He claims he asked to see a copy of the Consulting Agreement, but "nothing was provided" to him; nevertheless, he signed the signature page for the Consulting Agreement. Id. He now avers that the first time he "saw the assembled consulting document was when [IRT] LLC included the documents in its January 15th [2015] letter to my counsel in anticipation of its Summary Judgment motion in this litigation." Id.

The Consulting Agreement[17] set forth the terms governing Hughes' relationship with IRT LLC. It provided that he would be a member of IRT LLC's board of managers and would be paid an annual consulting fee of $100,000. In addition to the consulting fee, Hughes would be eligible to receive an annual bonus of up to $100,000, depending on IRT LLC's performance. The Consulting Agreement was for a one-year period, renewable upon mutual consent. It explicitly provided that IRT LLC was not assuming any obligation under the December 2012 Employment Contract and that Hughes agreed not to sue IRT LLC for any claim directly or indirectly related to that agreement:

> You acknowledge and agree that the Company [IRT LLC] is not assuming and will not assume (as part of the transactions between the Company and Seller [IRT Inc.] or otherwise) (i) any obligations of the Seller under the Employment Agreement between you and the Seller dated as of December 8, 2012 (your "Employment Agreement"); or (ii) any liabilities or obligations related, directly or indirectly, to your employment with the Seller or the separation of your employment with the Seller (together, "Seller Employment liabilities") and that all Seller Employment liabilities shall remain the sole responsibility of the Seller from and after the Closing. Without limiting the generality of the foregoing, you agree that you will not file or bring any action, proceeding, lawsuit, charge, complaint or claim (collectively, "Claim"), under any theory of liability, against the Company, any subsidiary of the Company, [or] any affiliate of the Company . . . that is directly or indirectly related to any Seller Employment Liability.

Consulting Agr. § 10. The agreement also contained an integration clause, which provided:

---

[17] The signed Consulting Agreement is attached as Exhibit B-8 to IRT LLC's First Summary Judgment Brief.

> This letter constitutes the entire agreement between you and the Company with respect to your engagement as a consultant to the Company and supersedes any prior agreement, promise, representation, or statement written or otherwise with regard to this subject matter, (ii) [sic] is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated in this letter, and (iii) [sic] cannot be modified or amended except in a writing signed by you and the Company.

Id. § 15.

On March 6, 2014, Hughes signed a revised consulting engagement letter, which was retroactively effective as of February 6, 2014 ("Revised Consulting Agreement").[18] Before signing, Hughes and Duffy negotiated the terms of the revised agreement. On February 26, 2014, Hughes e-mailed Duffy a first draft of the proposed new terms. See Ex. B-9. In contrast to Hughes' claim that he first saw the original Consulting Agreement during the course of this litigation, his February 26 e-mail references the "current signed agreement between IRT and [him]self," accurately describing the terms of the original Consulting Agreement as compensating him $100,000 for a one-year term as a director plus a bonus opportunity. Id.

The Revised Consulting Agreement removed Hughes from his position on the board of IRT LLC, shortened the term of his consulting engagement from one year to six months, cut his annual consulting fee in half, and eliminated the possibility for an annual bonus. It also provided that after the first six months, Hughes' consulting engagement would continue for six additional months on an as-needed basis at IRT LLC's discretion. Any consulting services he performed for IRT LLC during the latter six-month period would be paid "at a daily rate to be determined." Rev. Consulting Agr. § 1. The Revised Consulting Agreement contained the same covenant not to sue and integration clauses as had the Consulting Agreement. See id. §§ 9, 14. Hughes does

---

[18] Hughes' Revised Consulting Agreement is attached as Exhibit B-12 to IRT LLC's First Summary Judgment Brief.

not deny signing this agreement but claims he only signed it because Duffy threatened that, if he

did not sign it, IRT LLC "would pay [him] nothing." Hughes Aff. ¶ 44.

## II.   AMENDED COMPLAINT AND PROCEDURAL POSTURE

Hughes initiated this civil action in an attempt to disavow the contracts he signed in

connection with IRT LLC's purchase of IRT Inc.'s assets. Before conducting discovery, IRT

LLC moved for summary judgment based on the clear and unambiguous language of all the

contracts signed by Hughes. Hughes filed an opposition to summary judgment and

simultaneously filed an Amended Complaint, which introduced two new counts. IRT LLC

responded to the Amended Complaint with a second motion for summary judgment.

In his eight-count Amended Complaint, filed on February 26, 2015, Hughes claims that

he was fraudulently induced into signing all of the APA documents and his Consulting

Agreements, that IRT LLC remains liable to him under his December 2012 Employment

Contract with IRT Inc., and that the purchase price under the APA was unfairly low. Counts 1

through 4 raise claims for fraud and promissory estoppel against IRT LLC, with Hughes seeking

"damages of no less than $3,172,524" for each of Counts 1 through 4, and additionally seeking

punitive damages of $1,500,000 for Count 1 and Count 4. Am. Compl. ¶¶ 136-39.

Counts 5 through 7 relate to Hughes' December 2012 Employment Contract. Count 5

raises multiple claims under Maryland law, including successor liability and creditor's rights in

the event of a fraudulent conveyance. Lastly, in Count 5, Hughes claims that as a creditor of IRT

Inc., he is entitled to relief under Md. Code Ann., Com. Law § 15-204 because the transfer of

assets under the APA rendered IRT Inc. insolvent. For this count, Hughes seeks to hold IRT

LLC liable for the December 2012 Employment Contract "and/or" to have "the conveyance set

aside or obligation annulled to the extent necessary to satisfy the claim" or to "[l]evy on or

garnish the property conveyed as if the conveyance were not made." Am. Compl. ¶ 140 (quoting Md. Code Ann., Com. Law § 15-209(a)(2)).

Count 6 raises a claim for breach of the December 2012 Employment Contract against both IRT LLC and IRT Inc.  In this count, Hughes alleges that IRT LLC is bound by his December 2012 Employment Contract and that this contract remains in full force.  Count 6 further alleges that both IRT LLC and IRT Inc. have failed to pay Hughes in accordance with the annual compensation and severance terms of that contract, thereby entitling Hughes to "damages of no less than $1,331,161." Id. ¶ 141.

Count 7 raises a statutory claim of failure to pay severance against both IRT LLC and IRT Inc. based on defendants' breach of the severance terms in Hughes' December 2012 Employment Contract.  In addition to the severance package amount of $740,132, Hughes seeks treble damages totaling $2,220,396 and attorneys' fees under Md. Code Ann., Lab. & Empl. § 3-507.2, which provides employees relief for wrongfully withheld wages.  Id. ¶ 142.

Lastly, Count 8 raises a claim of unjust enrichment against IRT LLC.  This count alleges that Hughes' approval of the APA, which resulted in his forfeiting the value of his 37% equity in IRT Inc., conferred a substantial benefit on IRT LLC for which IRT LLC failed to pay fair value because, according to Hughes, the APA purchase price was unfairly low.  For this count, Hughes seeks "damages of an amount to be determined based on the value of the business less the [IRT] LLC $4.5 million purchase price." Id. ¶ 143.

On March 13, 2015, the Court heard oral argument on both of IRT LLC's motions for summary judgment and orally granted defendant's motions as to all counts.  Hughes filed the instant Motion for Reconsideration in which he only addresses the decision to grant summary judgment on Counts 1, 2, 3, 4, and 8.  The Court heard oral argument on Hughes' Motion for

Reconsideration on April 17, 2015. Although the Motion for Reconsideration only takes issue with the Court's ruling on Counts 1 through 4 and 8, this Opinion will address the reasons for granting summary judgment on all counts in the Amended Complaint to present a complete explanation of the decision.

## III.   DISCUSSION

### A. <u>Standard of Review for Reconsideration</u>

Plaintiff's Memorandum in Support of his Motion for Reconsideration failed to identify the authority on which he bases the motion; however, his reply brief clarified that review should be governed by Fed. R. Civ. P. 54(b). Given that plaintiff's motion is directed at a prior order that did not result in a final judgment (because the claims against IRT Inc. remain outstanding), Rule 54(b) is the proper mechanism by which to address the motion. See <u>Zaklit v. Global Linguist Solutions, LLC</u>, No. 1:14-cv-314, 2014 WL 4161981, at *1 (E.D. Va. Aug. 19, 2014) (citing <u>Bradford v. HSBC Mortg. Corp.</u>, 838 F. Supp. 2d 424, 427 (E.D. Va. 2012; <u>Netscape Commc'ns Corp. v. ValueClick, Inc.</u>, 704 F. Supp. 2d 544, 546 (E.D. Va. 2010)).

Rule 54(b) provides, in pertinent part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). The resolution of motions to reconsider pursuant to Rule 54(b) is "committed to the discretion of the district court," <u>Am. Canoe Ass'n v. Murphy Farms, Inc.</u>, 326 F.3d 505, 515 (4th Cir. 2003), which may be exercised "as justice requires," <u>Zaklit</u>, 2014 WL 4161981, at *2. "The Fourth Circuit has made clear that the standards governing reconsideration of final judgments are not determinative of a Rule 54(b) motion." <u>Id.</u> (citing <u>Am. Canoe</u>, 326 F.3d at 515). "Yet, many courts in this circuit have appropriately considered those factors in

guiding the exercise of their discretion under Rule 54(b)." Id. (collecting cases); see also In re

C.R. Bard, Inc., No. 2:11-cv-114, 2013 WL 2949033, at *2 (S.D.W. Va. June 14, 2013) ("[T]his

district has been guided by the general principles of Rules 59(e) and 60(b) in determining

whether a Rule 54(b) motion should be granted." (internal quotation marks omitted)).

Accordingly, courts generally do not depart from a previous ruling unless "(1) a subsequent trial

produces substantially different evidence, (2) controlling authority has since made a contrary

decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would

work manifest injustice." Zaklit, 2014 WL 4161981, at *2 (quoting Am. Canoe, 326 F.3d at

515). Such factors "rarely arise and the motion to reconsider should be equally rare." Id.

(quoting Above The Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va.

1983)).

"[M]ere disagreement with the district court's ruling does not warrant a motion for

reconsideration, and such motions should not be used 'to raise arguments which could have been

raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel

legal theory that the party had the ability to address in the first instance.'" Id. (quoting Pac. Ins.

Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998)). "A motion for

reconsideration is 'an extraordinary remedy which should be used sparingly.'" Id. (quoting Pac.

Ins. Co., 148 F.3d at 403)).

### B. The Court's Summary Judgment Ruling on Counts 1 through 4 and 8

Plaintiff's Motion for Reconsideration does not assert an intervening change in the law or

new evidence. Rather, most of Hughes' arguments are reiterations of arguments addressed by

the prior decision on IRT LLC's motions for summary judgment. Therefore, it is necessary to

provide an overview of the reasoning behind that decision. In its summary judgment ruling, the

Court viewed the record in the light most favorable to Hughes, the nonmoving party. See Nesari

v. Taylor, 806 F. Supp. 2d 848, 860 (E.D. Va. 2011) (citing Bryant v. Bell Atl. Md., Inc., 288

F.3d 124, 132 (4th Cir. 2002)).  Ultimately, the Court granted summary judgment in favor of IRT

LLC because Hughes could only point to "the mere existence of a scintilla of evidence" in

support of his position, which is insufficient to entitle the lawsuit to go forward.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Thompson Everett, Inc. v. Nat'l Cable

Adver., L.P., 57 F.3d 1317, 1322-23 (4th Cir. 1995) ("The disputed facts must be material to an

issue necessary for the proper resolution of the case, and the quality and quantity of the evidence

offered to create a question of fact must be adequate to support a jury verdict.").

### 1.  Fraud and Promissory Estoppel Claims (Counts 1 - 4)

The first four counts involve similar allegations of fraudulent oral misrepresentation and

are therefore discussed together.  In Count 1, Hughes alleges[19] that Joseph Duffy and Thomas

Ripley intentionally misrepresented that IRT LLC would retain him as CEO of IRT LLC,

"continue to pay him as specified in his [December 2012] Employment Contract," and provide

him "with a fair part (from 5% down to 2.5%) of the revenues from the IRT sales pipeline."  Am.

Compl. ¶ 84.  Count 1 further alleges that when these three misrepresentations were made, IRT

LLC had no intention of performing them, making them solely to induce Hughes to accept the

APA on behalf of IRT Inc.  He also alleges that he reasonably relied on the misrepresentations

when he signed the APA and related documents and that IRT LLC subsequently failed to follow

through on any of these representations.  Count 2 raises a constructive fraud claim against IRT

LLC based on the same allegations as Count 1.  Relying on the same allegations, Count 3 raises a

claim of fraudulent inducement.

---

[19] Although IRT LLC denies making any false representations to Hughes, it assumed arguendo
that they were made for the purposes of summary judgment, and it based its motions for
summary judgment on the contracts, the e-mails to which Hughes was a party, and Hughes' own
affidavit.  See IRT LLC's First Summary Judgment Brief 17-18.

In Count 4, Hughes raises a claim for promissory estoppel against IRT LLC, characterizing the above three misrepresentations as promises that were made to induce him into accepting the APA on behalf of IRT Inc. As in the first three counts, Count 4 alleges that Duffy and Ripley reasonably expected these false promises to induce Hughes into signing the APA and Consulting Agreements, that Hughes reasonably relied on the promises when he signed the documents, and that IRT LLC failed to follow through on any of the three promises. Count 4 further specifies that the third promise—that IRT LLC would provide Hughes with a fair part of the sales pipeline revenue—was designed as a substitute for the loss of the value of his common stock in IRT Inc.

A common element in these four counts is that Hughes reasonably relied on the alleged false promises or misrepresentations.[20] In his opposition to summary judgment, Hughes argued

---

[20] The parties agree that Maryland law applies to all of the claims in the Amended Complaint. Under Maryland law, the elements of fraud based on an affirmative misrepresentation are: "(1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation." Hoffman v. Stamper, 867 A.2d 276, 292 (Md. 2005).

Constructive fraud is "a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." Scheve v. McPherson, 408 A.2d 1071 (Md. Ct. Spec. App. 1979). "Constructive fraud is nonetheless fraud. Therefore, the elements of fraud not resting on intent or dishonesty remain essential." Son v. Margolius, Mallios, Davis, Rider & Tomar, 689 A.2d 645, 661 (Md. Ct. Spec. App. 1997) (citation omitted), rev'd on other grounds, 709 A.2d 112 (Md. 1998). Moreover, "constructive fraud . . . usually arises from a breach of duty where a relationship of trust and confidence exists." Hanley v. Doctors Exp. Franchising, LLC, No. Civ. A. ELH-12-795, 2013 WL 690521, at *18 (D. Md. Feb. 25, 2013) (internal quotation marks omitted). "[G]enerally, business relationships are not confidential relationships. Where businesses are engaged in an 'arm's length' transaction, a confidential relationship does not exist." Id.

Fraudulent inducement "means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment." Rozen v. Greenberg, 886

that whether his reliance was objectively reasonable is a factual dispute that precludes summary judgment.

Although the matter of reasonableness of reliance is "ordinarily" an issue reserved for the factfinder, "there are instances when a sophisticated business entity's reliance on an oral promise may be unreasonable as a matter of law." 200 N. Gilmor, LLC v. Capital One, Nat. Ass'n, 863 F. Supp. 2d 480, 491 (D. Md. 2012) (collecting cases). In Hughes' case, the record overwhelmingly establishes that any reliance by Hughes on the three alleged misrepresentations was unreasonable as a matter of law. First, Hughes clearly acknowledges in his affidavit that Ripley, Duffy, and Ruiz informed him on or around January 23, 2014—two weeks before he signed any binding documents—that he would not be staying on as CEO of IRT LLC.[21] Therefore, Hughes' claim that he signed the APA and related documents in reliance on the representation that he would retain his CEO position was unreasonable as a matter of law.

---

A.2d 924, 929 (Md. Ct. Spec. App. 2005). Fraudulent inducement is encompassed by fraud, and a plaintiff asserting a claim for fraudulent inducement must still demonstrate the elements of civil fraud based on an affirmative misrepresentation. See id.

Lastly, promissory estoppel has four elements: "(1) a clear and definite promise which (2) the promisor has a reasonable expectation . . . will induce action or forbearance on the part of the promisee and (3) which does induce actual and reasonable action or forbearance by the promisee, (4) causing a detriment which can only be avoided by the enforcement of the promise." 200 N. Gilmor, LLC v. Capital One, Nat. Ass'n, 863 F. Supp. 2d 480, 490 (D. Md. 2012) (internal quotation marks omitted).

[21] Specifically, Hughes affirmed:

Likely on January 23rd (this could be several days later), 2-3 weeks after I had signed the [non-binding] Letter of Intent, Tom Ripley, a member of Severn Partners and an [IRT] LLC Board member, Joe Duffy, and Coleman Ruiz, stepped into my office at IRT [Inc.] at around 11:00 a.m. In a meeting that lasted no more than 15 minutes, they told me for the first time that I would not be the CEO and President of the business. I could continue as a member of the Board. There was no mention in that meeting of the existing Employment Contract or the Severance Package."

Hughes Aff. ¶ 33.

Similarly, any reliance by Hughes on the alleged false promises or misrepresentations regarding compensation (including compensation under the December 2012 Employment Contract and compensation from sales pipeline revenue) is unreasonable and unjustifiable as a matter of law in light of the unambiguous language in the APA and both the original and revised Consulting Agreements, which made clear that the December 2012 Employment Contract would not be enforced. Moreover, both Consulting Agreements specifically described Hughes' new compensation plan without making any mention of sales pipeline revenue. Lastly, both of those Consulting Agreements, which Hughes signed, included a covenant under which he agreed not to sue for any issue related to the December 2012 Employment Contract, as well as a full integration clause.[22]

The emails attached to IRT LLC's memoranda in support of summary judgment belie Hughes' allegations that he "had no role in the preparation of the APA documents," Hughes Aff. ¶ 37, and that he did not see the original Consulting Agreement before signing it, see id. ¶ 39. See Exs. D-1 to D-14 (e-mails, to which Hughes was a party, documenting the progress of the negotiations over the APA); Ex. B-9 (Hughes' e-mail to Duffy regarding modifying his "current signed agreement" (i.e., his allegedly unseen Consulting Agreement) and accurately describing the terms of that agreement). Additionally, Hughes' filings in this litigation are inconsistent regarding whether he received or knew the contents of his original Consulting Agreement before signing it. For example, plaintiff's opposition to summary judgment states that "[IRT] LLC quickly revoked the 2014 Consulting Agreement given to Gen. Hughes prior to Closing" and replaced it with the terms contained in the Revised Consulting Agreement. Pl.'s Opp'n Mot.

---

[22] IRT LLC also argues that Maryland's statute of frauds bars enforcement of the alleged unwritten promise to pay Hughes fees tied to revenues of sales that were in the pipeline because the performance of such a promise could not be performed within one year.

Summ. J. 13 [Dkt. No. 34] (emphasis added).  Therefore, the record evidence demonstrates that Hughes was aware of the contents of the APA before signing it, and Hughes' own statements coupled with the record evidence contradict Hughes' claim that he was unaware of the contents of the Consulting Agreements before signing them.

Hughes' admission that he signed the signature pages of key documents without first reading them is fatal to his case.  As the CEO of the company being sold, he is presumed to have been aware of the contents of the contracts he was signing, especially given his level of sophistication and business experience.  See Walther v. Sovereign Bank, 872 A.2d 735, 745 (Md. 2005) ("[T]he law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms."); see also supra n.2 (summarizing Hughes' education, military career, and business experience).  Hughes states that, on February 5, 2014, he asked to see the Consulting Agreement before signing it but it was not provided; yet he signed it anyway.  It is unconscionable that a well-educated and self-described sophisticated businessman such as Hughes would repeatedly sign contracts without first demanding to see what he was signing only to be able to contest those same contracts later.

Lastly, Hughes argued in opposition to summary judgment that his Revised Consulting Agreement is voidable because he signed it under economic duress based on Duffy's threat that he would get nothing if he did not sign it.  See Hughes Aff. ¶ 44.  Even if the Revised Consulting Agreement were found to be voidable, the original Consulting Agreement would then be the prevailing contract governing Hughes' relationship with IRT LLC, as there is no allegation that the original Consulting Agreement was signed under duress.  The original Consulting Agreement contains the same language disavowing the December 2012 Employment Contract and the same covenant not to sue.  Given the overwhelming evidence in the record contradicting Hughes'

claims of oral misrepresentations and also establishing that any reliance on such representations would have been objectively unreasonable, the Court granted IRT LLC's motions for summary judgment on Counts 1 through 4.

### 2. Unjust Enrichment Claim (Count 8)

In Count 8, which raises a claim for unjust enrichment against IRT LLC, Hughes contends that his approval of the APA and "his forfeiting the value of his 37% equity in [IRT Inc.'s] common stock so that [IRT] LLC could purchase the assets for a very low sales price conferred a substantial benefit on [IRT] LLC." Am. Compl. ¶ 132. Under Maryland law, the elements of unjust enrichment are "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit 'under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.'" Royal Inv. Grp., LLC v. Wang, 961 A.2d 665, 684 (Md. Ct. Spec. App. 2008) (quoting Hill v. Cross Country Settlements, LLC, 936 A.2d 343, 351 (Md. 2007)). In opposing summary judgment on this count, Hughes argued that whether he conferred a benefit upon IRT LLC was a question of fact for the jury.

Hughes' unjust enrichment claim improperly equates Hughes with IRT Inc. IRT Inc. as a corporation made the decision to sell its assets to IRT LLC. IRT Inc. was represented by competent counsel throughout the sale process and received substantial value, $4.5 million, for its assets.[23] Although Hughes approved the APA in his capacity as a shareholder, director, and CEO of IRT Inc., the benefit conferred on IRT LLC—IRT Inc.'s assets—did not belong to Hughes personally. See The Fischer Org., Inc. v. Landry's Seafood Restaurants, Inc., 792 A.2d 349, 356 (Md. Ct. Spec. App. 2002) ("Unjust enrichment of a person occurs when he [or she] has

---

[23] Moreover, there is evidence that, without the APA, BB&T was going to execute on its security interests or cause IRT Inc. to return to bankruptcy. See Ripley Aff. ¶¶ 21-22.

and retains money or benefits which in justice and equity belong to another."). Accordingly, the Court granted summary judgment in favor of IRT LLC on Count 8.

## C. **Motion for Reconsideration**

In support of his Motion for Reconsideration, Hughes reiterates his arguments from his opposition to summary judgment focusing on his position that whether he reasonably relied on the alleged pre-contract, oral misrepresentations and whether he conferred a benefit upon IRT LLC are questions of fact for the jury. In response, IRT LLC argues that reconsideration is not warranted because Hughes does not assert any intervening change in the controlling law or any new evidence that was not previously available. Each of the contested rulings is addressed in turn.

### 1. Fraud and Promissory Estoppel Claims (Counts 1 - 4)

In his Motion for Reconsideration, Hughes only asks the Court to reconsider its position with respect to the alleged misrepresentation that he would receive a percentage of the sales pipeline revenue. Specifically, Hughes reiterates his argument that whether his reliance on the sales pipeline revenue promise or misrepresentation was reasonable, in the context of his fraud and promissory estoppel claims, is a factual dispute precluding summary judgment and, therefore, the Court erred in granting summary judgment in favor of IRT LLC without allowing him to obtain discovery. He does not seek reconsideration on the decision regarding the alleged misrepresentations that he would remain the CEO and that his December 2012 Employment Contract with IRT Inc. (including the severance package) would be honored by IRT LLC.

As previously discussed, any reliance by Hughes on a promise or misrepresentation that he would receive a percentage of the sales pipeline revenue was unreasonable as a matter of law in the face of the clear language of the APA documents and Consulting Agreements that he signed. Although the APA itself does not address Hughes' compensation, it does provide that

IRT LLC "shall offer employment to the Senior Executives on the terms set forth in offer letters provided to each of the Senior Executives prior to Closing." APA § 6.6(a). The original Consulting Agreement clearly articulated the manner in which IRT LLC would offer employment, the terms of that employment, and the compensation for such employment. It contained no reference to any sales pipeline revenue.

Hughes also reiterates his argument that he should not be bound by the terms of the Consulting Agreements because "he had not seen or been given any 'offer letter'" at the time he signed the APA. Pl.'s Mem. Supp. Mot. Recons. 5. That claim is contradicted by the APA, which states that the senior executives of IRT Inc. had in fact been provided with their offer letters "prior to Closing." Moreover, Hughes signed the Written Consent of Board of Managers of IRT LLC, stating that he (along with the other members of the board) had "reviewed" his offer letter and approved it "in all respects" on behalf of IRT LLC, see IRT LLC's First Summ. J. Br., Ex. B-6(C); and he signed both Consulting Agreements, see Walther, 872 A.2d at 745 ("[T]he law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms.").

Finally, Hughes' pleadings have been inconsistent as to whether and when he saw the terms of the original Consulting Agreement. Although he argues that he never saw the Consulting Agreement until this litigation, see Hughes Aff. ¶ 39, his brief in opposition to summary judgment states that IRT "LLC quickly revoked the 2014 Consulting Agreement given to Gen. Hughes prior to Closing." Pl.'s Opp'n Mot. Summ. J. 13 (emphasis added). He also contends that the Consulting Agreement he signed on February 5 was revoked by Duffy at a meeting between the two of them on February 25, 2014. See Hughes Aff. ¶¶ 40-41. At that meeting, Duffy allegedly brought with him only a signature page for a revised version of the

Consulting Agreement and coerced Hughes into signing it by assuring him that only minor changes had been made to the agreement and by threatening that he either sign it or he "was off the Board and out as a consultant." Id. ¶¶ 41-42. Hughes further avers that "the next time [he] saw that signature page," it was attached to a revised version of the Consulting Agreement that contained more than minor changes:

> The terms of this document were not "minor" changes, as Duffy had represented, but I appreciate now that the terms could strip me of the Employment Contract compensation, including severance, and also erase the promises of fees from the sales pipeline and more. The agreement also further decreased my compensation, removed the bonus provision, shortened the consulting time period, and was devoid of the promised pipeline deal that I had relied upon.

Id. ¶ 43. There is no evidence of this alleged February 25 modification to the Consulting Agreement. Instead, these changes all appear in the Revised Consulting Agreement that Hughes signed on March 6, 2014 (but which he wrote as being effective as of February 6, 2014). In contrast to Hughes' version of events, Duffy avers that he and Hughes first discussed reevaluating Hughes' role with IRT LLC on or about February 25 and that he asked Hughes to send him a first draft of a revised consulting agreement. See Duffy Aff.[24] ¶ 11. Duffy's version of events is corroborated by an e-mail sent from Hughes to Duffy on February 26, in which Hughes outlines proposed new terms for a revised consulting agreement. See Ex. B-9. That e-mail also contradicts Hughes' statement that he never saw the original Consulting Agreement before this litigation because the e-mail references the "current signed agreement between IRT and [him]self" and accurately describes some of the terms of the original Consulting Agreement. See id. This e-mail also demonstrates that Hughes understood that the original Consulting Agreement was still in effect at that time. Notably, in that e-mail, Hughes summarizes his compensation under the original Consulting Agreement and proposes new compensation terms

---

[24] Duffy's affidavit is attached as Exhibit B to IRT LLC's First Summary Judgment Brief.

for the forthcoming Revised Consulting Agreement.  Most telling, Hughes does not make any reference to sales pipeline revenue in that e-mail.

For all these reasons, as well as those previously stated, any reliance by Hughes on any alleged misrepresentation that he would be entitled to a percentage of the revenue from the sales pipeline was unreasonable as a matter of law.  See First Union Nat. Bank v. Steele Software Sys. Corp., 838 A.2d 404, 445-46 (Md. Ct. Spec. App. 2003) ("[The plaintiff] cannot reasonably rely on an agreement or representation that was specifically negotiated out of the parties' contract. . . . The agreements in this case are between sophisticated businessmen. . . . After consulting with counsel at all stages of the transaction and closing on detailed written documents, it is not reasonable for [the plaintiff] to rely on oral promises that directly contradict the written agreements between the parties." (internal quotation marks omitted)).

2.  Unjust Enrichment Claim (Count 8)

In addition to his arguments regarding the alleged sales pipeline promise, Hughes continues to press his argument that whether IRT LLC "paid value" for IRT Inc.'s assets and whether Hughes conferred a benefit upon IRT LLC are questions of fact for the jury.  The uncontested facts are that "BB&T directed that the company be sold," and "BB&T was . . . willing to accept the low price, and pushed for the sale at that price."  Hughes Aff. ¶¶ 19, 28. The APA was an arms-length transaction negotiated by competent counsel on both sides. Hughes chose not to retain separate counsel, and he agreed to the purchase price by approving and executing the APA.  Therefore, he cannot now claim that the purchase price which he agreed to all along was an unfair amount.  Hughes also continues to argue that the "benefit" he conferred was IRT Inc.'s assets.  Because the assets sold belonged to IRT Inc., Hughes did not personally bestow any benefit upon IRT LLC; rather, IRT Inc. was the party that bestowed any benefit on IRT LLC.  Moreover, the APA required more than just Hughes' approval.  In addition

to Hughes endorsing the APA, Voelkel and McMullen, the other two members of IRT Inc.'s executive team, also approved the APA in their capacities as voting shareholders and directors of IRT Inc. See IRT LLC's First Summ. J. Br., Ex. B-4 (Unanimous Written Consent of the Board of Directors of IRT. Inc.); id. Ex. B-5 (Unanimous Written Consent of the Voting Shareholders of IRT Inc.). Accordingly, the sale of IRT Inc.'s assets required more than Hughes' lone approval and the assets were not his to personally confer on IRT LLC.

### 3. Integration Clauses and Covenant Not to Sue

In his Motion for Reconsideration, Hughes reiterates his contention that the integration language in the APA and in his Consulting Agreements does not bar his claims for fraud, promissory estoppel, or unjust enrichment. Specifically, he repeats his claim that he did not sign the APA in his individual capacity and therefore is not bound by the integration clause therein. This argument is a red herring because the key integration clause is the one appearing in his Consulting Agreements as those are the contracts that clearly contradict any alleged sales pipeline revenue promises. Hughes undeniably signed the Consulting Agreements in his individual capacity to accept the employment offer from IRT LLC. The integration clause appearing in both of his Consulting Agreements provided:

> This letter constitutes the entire agreement between you and the Company with respect to your engagement as a consultant to the Company and supersedes any prior agreement, promise, representation, or statement written or otherwise with regard to this subject matter, (ii) [sic] is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated in this letter, and (iii) [sic] cannot be modified or amended except in a writing signed by you and the Company.

Consulting Agr. § 15; Rev. Consulting Agr. § 14.

Hughes argues for the first time in his Motion for Reconsideration that the integration clause in his Consulting Agreements is not a complete integration clause because the clause only addresses his engagement as a consultant and not his position on the board. Therefore, Hughes

25

contends that whether the sales pipeline revenue promise is included in his "engagement as a consultant," so as to be within the scope of the integration clause, is a question for the jury. Hughes does not explain why this argument could not have been made in his opposition to the motions for summary judgment. Moreover, the Consulting Agreement, and later the Revised Consulting Agreement, are the only written agreements defining the relationship between Hughes and IRT LLC. The Consulting Agreements laid out the express parameters of Hughes' compensation, and the sales pipeline revenue was not included in that compensation. Therefore, the alleged sales pipeline revenue promise was within the scope of the integration clause.

Hughes also repeats his argument that "the existence of an integration clause in a written contract, standing alone, does not bar a fraud count." Greenfield v. Heckenbach, 797 A.2d 63, 72 (Md. Ct. Spec. App. 2002). This argument ignores the totality of the record, which was considered in the summary judgment ruling. As explained above, the fraud and promissory estoppel counts fail because Hughes cannot show that his reliance was reasonable. Although the integration clause was a factor in this consideration, it was not the sole factor on which the Court based its summary judgment decision.

Finally, Hughes argues that the covenant not to sue in the Consulting Agreements does not bar his promissory estoppel, fraud, or unjust enrichment claims based on the alleged sales pipeline promise because that covenant only covered IRT LLC's potential liability for the December 2012 Employment Contract. The outer limits of the covenant not to sue need not be determined because the Court's decision rests on the patently unreasonable nature of any reliance

by Hughes on a belief that he had been promised compensation based on pipeline sales revenue.[25]

For all these reasons, summary judgment in favor of IRT LLC on Counts 1 through 4 and 8 was appropriate, and the Motion for Reconsideration will be denied.

### D. Remaining Claims in the Amended Complaint

In the interest of a complete record, this Opinion addresses the Court's grant of summary judgment in favor of IRT LLC on Counts 5, 6, and 7, although Hughes did not contest these rulings in his Motion for Reconsideration.

#### 1. Successor Liability and Fraudulent Conveyance (Count 5)

Count 5 of the Amended Complaint raises claims for successor liability "pursuant to case law and/or Md. Code Ann., Com. Law §§ 15-204 and 15-209(a)(2)." In this count, Hughes alleges that IRT LLC is a "successor" to IRT Inc., as defined in Md. Code Ann., Corps. & Ass'ns § 1-101(bb),[26] and that as a successor, IRT LLC acquired the liabilities and debts of IRT Inc.,

---

[25] Hughes also argues for the first time that the Revised Consulting Agreement is voidable because it lacked new consideration. See Pl.'s Mem. Supp. Mot. Recons. 9 n.7. As previously explained, even if the Revised Consulting Agreement were found to be voidable, the operative contract would be the original Consulting Agreement. There is no allegation that the original Consulting Agreement was signed under duress or without consideration. Hughes' sole argument regarding the supposed invalidity of the original Consulting Agreement is that he was fraudulently induced into signing it by Duffy's alleged misrepresentations; however, this argument has been rejected. See supra Part III(B)(1), (C)(1) (discussing Hughes' fraud and promissory estoppel claims in the context of summary judgment and on reconsideration).

[26] This statute provides:

  (bb) "Successor" means:

  (1) A new corporation formed by consolidation;

  (2) A corporation or other entity surviving a merger;

  (3) A corporation acquiring stock in a share exchange; or

  (4) A vendee, lessee, or other transferee in a transfer of assets.

Md. Code Ann., Corps. & Ass'ns § 1-101(bb).

including Hughes' December 2012 Employment Contract, under an exception to the general rule

of non-liability for successor entities[27] for a "fraudulent [conveyance], not made in good faith, or

made without sufficient consideration." Am. Compl. ¶ 109 (quoting Nissen Corp. v. Miller, 594

A.2d 564, 566 (Md. 1991)) (alteration in original).  To support his fraudulent conveyance and

insufficient consideration theories, Hughes asserts that IRT Inc.'s assets were valued between

$21.6 and 26.4 million at the time of the APA, before subtracting the debt owed to BB&T,[28] yet

IRT LLC purchased substantially all of the assets for $4.5 million.  Also in Count 5, Hughes

seeks relief under Md. Code Ann., Com. Law § 15-209(a)(2), which provides rights to a creditor

whose claim has matured in the event of a fraudulent conveyance.[29]  In support of this relief,

Hughes alleges that he was a creditor of IRT Inc. at the time of the APA pursuant to his

---

[27] The Court of Appeals of Maryland describes the "traditional rule of corporate successor liability" as follows:

> [A] corporation which acquires all or part of the assets of another corporation does not acquire the liabilities and debts of the predecessor, unless:  (1) there is an express or implied agreement to assume the liabilities; (2) the transaction amounts to a consolidation or merger; (3) the successor entity is a mere continuation or reincarnation of the predecessor entity; or (4) the transaction was fraudulent, not made in good faith, or made without sufficient consideration.

Nissen Corp. v. Miller, 594 A.2d 564, 565-66 (Md. 1991) (quoting treatises) (adopting the general rule of non-liability of successor corporations, with its four traditional exceptions, in the products liability context).

[28] Hughes supports this estimate with an expert affidavit attached as Exhibit 2 to his opposition to summary judgment [Dkt. No. 34].  See Martin Aff. ¶ 22.

[29] Specifically, this statute provides:

> (a) If a conveyance or obligation is fraudulent as to a creditor whose claim has matured, the creditor, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase or one who has derived title immediately or immediately from such a purchaser, may:
>
> (1) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy the claim; or
>
> (2) Levy on or garnish the property conveyed as if the conveyance were not made.

Md. Code Ann., Com. Law § 15-209(a).

December 2012 Employment Contract. Lastly, Hughes claims that, as a creditor of IRT Inc., he is entitled to relief under Md. Code Ann., Com. Law § 15-204 because the transfer of assets under the APA rendered IRT Inc. insolvent.[30]

Although IRT LLC constitutes a "successor" of IRT Inc. under Md. Code Ann., Corps. & Ass'ns § 1-101(bb) because it was the "transferee in a transfer of assets," a successor does not acquire the liabilities and debts of the predecessor unless one of four exceptions is met. See Nissen Corp., 594 A.2d at 565-66. Hughes argues that the fourth exception—that "the transaction was fraudulent, not made in good faith, or made without sufficient consideration"— applies here because he was fraudulently induced into signing the APA documents and for lack of fair consideration. The fraudulent inducement argument fails for the same reasons, stated above, which defeated Hughes' fraud and promissory estoppel claims: his reliance on any misrepresentations was unreasonable as a matter of law given the documents, including e-mails, and his own affirmations.

Hughes' consideration argument is similarly meritless. Hughes was fully aware of the purchase price for at least a month leading up to the closing of the APA. See LOI § 1(c); Hughes Aff. ¶¶ 24, 26, 28. As the President and CEO of IRT Inc., no one was in a better position than Hughes to reject the APA. Instead, he approved the APA in all respects and executed all APA documents "as IRT's CEO and President, as a Director, and as a shareholder." Id. ¶ 37. Moreover, IRT Inc. was represented by counsel during the entire process. Most telling is that the

---

[30] This statute provides:

> Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Md. Code Ann., Com. Law § 15-204.

transfer of assets was an alternative to BB&T's threat to foreclose on its secured interests in IRT Inc. or force IRT Inc. into filing for bankruptcy again. See Ripley Aff. ¶¶ 21-22. Under these circumstances, the lack of fair consideration exception does not apply, and there is no basis in Maryland law to find successor liability.

Next, Hughes seeks relief under Md. Code Ann., Com. Law § 15-209(a)(2), which provides a creditor with rights in the event of a fraudulent conveyance. In support of this relief, Hughes argues that he was a creditor of IRT Inc. at the time of the APA pursuant to his December 2012 Employment Contract. The Court need not address whether Hughes was a creditor of IRT Inc. because, even assuming he were, as discussed above, there is no evidence that the APA was a fraudulent conveyance.

Lastly, Hughes claims that, as a creditor of IRT Inc., he is entitled to relief under Md. Code Ann., Com. Law § 15-204 because the transfer of assets under the APA rendered IRT Inc. insolvent. This statute only provides relief "if the conveyance is made . . . without a fair consideration." Md. Code Ann., Com. Law § 15-204. Because Hughes cannot show that the conveyance was made without fair consideration, this claim fails along with the other claims in Count 5. Accordingly, the Court granted summary judgment in favor of IRT LLC on this count.

   2. <u>Breach of December 2012 Employment Contract and Failure to Pay Severance (Counts 6 and 7)</u>

Count 6 raises a claim for breach of Hughes' December 2012 Employment Contract against both IRT Inc. and IRT LLC. This count asserts that IRT LLC is bound by Hughes' December 2012 Employment Contract because IRT LLC was substituted for IRT Inc. (the original party to the contract) under the terms of that contract and because IRT LLC "adopted or accepted [that] contract by its words and deeds." Count 6 further alleges that the December 2012

Employment Contract remains in full force and that IRT LLC has failed to pay Hughes in accordance with the terms of that contract.

This claim fails as to IRT LLC because in both the APA and Hughes' Consulting Agreements, IRT LLC expressly excluded this employment contract from the obligations it agreed to assume from IRT Inc. See, e.g., APA § 6.6(d). Moreover, in both of his Consulting Agreements, Hughes covenanted not to sue IRT LLC "under any theory of liability" related to the December 2012 Employment Contract. See Consulting Agr. § 10; Rev. Consulting Agr. § 9. Therefore, Hughes' claim against IRT LLC for breach of that contract is meritless and the Court granted summary judgment in favor of IRT LLC on this count; however, Hughes may still assert this claim against IRT Inc.

Lastly, Count 7 alleges under Md. Lab. & Empl. § 3-507.2[31] that both IRT Inc. and IRT LLC failed to pay Hughes severance. This count relies on Hughes' theory that the December 2012 Employment Contract is still in effect and that IRT LLC must, therefore, comply with the severance package provision after it terminated Hughes' position on the board without cause. As with Count 6, the APA language unambiguously excluded Hughes' December 2012 Employment Contract from the assumed liabilities, and the covenant not to sue IRT LLC contained in both of Hughes' Consulting Agreements defeats his claim against IRT LLC for failure to comply with

---

[31] This statute provides:

> (a) Notwithstanding any remedy available under § 3-507 of this subtitle, if an employer fails to pay an employee in accordance with § 3-502 or § 3-505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages.

> (b) If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

Md. Code Ann., Lab. & Empl. § 3-507.2.

the severance provisions of his December 2012 Employment Contract.  Accordingly, the Court

granted summary judgment in IRT LLC's favor on this count; although this count may go

forward against IRT Inc.

## IV.   CONCLUSION

The Court has a duty to conserve judicial resources by preventing meritless actions from

going forward, and summary judgment "is favored as a mechanism to secure the 'just, speedy,

and inexpensive determination' of a case when its proper use can avoid the cost of trial."

Thompson Everett, Inc., 57 F.3d at 1322-23 (quoting Fed. R. Civ. P. 1).  Although IRT LLC

filed its motions for summary judgment before the start of discovery, nothing prevented Hughes

from obtaining affidavits from anyone who could corroborate his version of the facts to support

his opposition to summary judgment.  Hughes provided some evidence to oppose IRT LLC's

motions—his own affidavit and the affidavit of expert Harold G. Martin, whom Hughes retained

in anticipation of this litigation to perform a valuation estimate of IRT Inc., see Martin Aff. ¶¶ 2-

3; however, it is significant that he did not obtain affidavits corroborating his claims of oral

misrepresentations from either of the other two members of the IRT Inc. executive team, Voelkel

or McMullen, both of whom—like Hughes—lost the value of their stock and employment

contracts with IRT Inc. in the APA deal.  Standing alone, Hughes' self-serving affirmations that

misrepresentations were made regarding his future with IRT LLC and that he reasonably relied

on those misrepresentations are not sufficient to prolong this civil action, especially in light of all

the documentary evidence provided by IRT LLC, much of which is uncontested, and the

significant inconsistencies within Hughes' version of the facts.

For all these reasons, as well as those stated during the hearing on April 17, 2015,

Plaintiff's Motion for Reconsideration will be denied by an appropriate Order to be issued with

this Memorandum Opinion.

Entered this 6th day of May, 2015.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge